# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

CLARK TECHNOLOGY LLC and
CLARK ENGINEERING
CORPORATION,

              Plaintiffs,

v.

CORNCOB INC. and PRO-
EQUIPMENT INC.,

              Defendants.

Case No. 18-CV-1559-JPS

**ORDER**

## 1.    INTRODUCTION

The parties to this lawsuit are in the wastewater treatment business. Plaintiffs Clark Technology LLC and Clark Engineering Corporation filed this action in October 2018, accusing Defendants Corncob Inc. and Pro-Equipment Inc. of breaching an alleged oral contract, among other alleged misdeeds. The thrust of Plaintiffs' complaint centers on relationships it had with Defendants and another player in the market who is not a party to this case, Apex Efficiency Solutions, SBC ("Apex"). Plaintiffs worked with Apex on several water treatment projects in Wisconsin and Minnesota and brought Defendants into the projects as their manufacturing subcontractor. For each of these projects, Plaintiffs contend that they had binding oral agreements with Defendants and Apex that neither would cut Plaintiffs out of the business relationship. Plaintiffs allege that starting in 2017, Defendants and Apex did just that.

This suit followed (though not before Apex filed a declaratory judgment action in Minnesota state court). In this case, Plaintiffs allege a

violation of the Lanham Act, seeking damages (Count I) and preliminary and injunctive relief (Count II), violation of the Wisconsin Deceptive Trade Practices Act (Count III), breach of contract (Count IV), breach of the duty of good faith and fair dealing (Count V), tortious interference with contract or prospective contractual relationship (Count VI), and contractual indemnification (Count VII). (Docket #1). Defendants bring three counterclaims, all concerning Plaintiffs' purported abuse of process. (Docket #16).

Each side has filed a motion for summary judgment, the Defendants seeking dismissal of all claims in the complaint and the Plaintiffs seeking dismissal of all counterclaims. Those motions are fully briefed and ripe for adjudication. For the reasons explained below, both motions will be granted. The flurry of other motions that the parties filed before and after their summary judgment submissions will be addressed herein as well, if only to note their mootness.

## 2.      MOTION TO DISMISS

Before addressing the parties' summary judgment motions, the Court turns first to a motion on which the Court has already weighed in but has not finally resolved: Plaintiffs' motion to voluntarily dismiss Counts IV, V, VI, and VII of their complaint without prejudice. (Docket #24). Defendants opposed the motion, arguing that dismissal should be with prejudice or, if without prejudice, accompanied by an award of fees. (Docket #28).

The Court agreed with Defendants. In light of the late stage of the lawsuit, together with Plaintiffs' concession that they could no longer meaningfully maintain the claims they sought to dismiss, the Court decided that forcing the parties to continue to expend resources to litigate claims

that all parties agree should be dismissed would be inefficient at best. (Docket #63). However, the Court also found that allowing Plaintiffs to amend their complaint under Rule 15(a)(2) to eliminate Counts IV through VII—which would essentially result in the dismissal of Counts IV through VII without prejudice—was warranted only upon payment of the reasonable fees and costs Defendants incurred to defend against those claims. *Id.* at 7–8. The Court left Plaintiffs to decide whether to amend their complaint and pay the Defendants' reasonable fees and costs, or to accept dismissal of Counts IV through VII with prejudice. *Id.* at 8.

Plaintiffs did neither. Instead, they moved the Court to reconsider and either order the Defendants to calculate and disclose their costs before Plaintiffs made their election regarding dismissal, allow Plaintiffs to withdraw their motion to dismiss, or simply deny their motion to dismiss and decide the case on the parties' motions for summary judgment. (Docket #66). Defendants opposed the motion for reconsideration, correctly noting that Plaintiffs had identified no error of law or fact that would warrant reconsideration. (Docket #68). Plaintiffs simply did not like the options the Court presented.

Subsequently, Defendants completed briefing on their motion for summary judgment on all of Plaintiffs' claims, including Counts IV through VII. In light of the messy state of Plaintiffs' motion to dismiss, and because dispositive motion briefing has demonstrated that dismissal on the merits of Counts IV through VII is appropriate, the Court will deny Plaintiffs' motion to dismiss (Docket #24), deny as moot their motion for reconsideration (Docket #66), and resolve Counts IV through VII under Rule 56.

However, the Court sympathizes with Defendants' position, having been made not only to defend against four claims that Plaintiffs then sought to abandon without penalty, but also having been made to engage in superfluous motion practice about those claims' dismissal while simultaneously briefing a summary judgment motion. This has no doubt been an unnecessary drain on Court and client resources.

It would be unfair to Defendants for the Court simply to resolve the merits of Counts IV through VII on summary judgment without any repercussion to Plaintiffs. To do so would let Plaintiffs off the hook for essentially ignoring the Court's directive to either accept dismissal with prejudice (before dispositive motion briefing was complete) or to pay Defendants' fees and dismiss without prejudice. As a penalty for their eleventh-hour delay tactics, the Court will order that Plaintiffs pay Defendants' reasonable fees and costs related to Defendants' preparation of a defense to Counts IV through VII. The Court is confident that the parties can confer on this issue and reach an amicable resolution without the need for further intervention by the Court.

3.      STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 states that the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). "Material facts" are those facts which "might affect the outcome of the suit," and "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, to demonstrate a genuine dispute about a material

fact, a party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The Court construes all facts and reasonable inferences in a light most favorable to the non-movant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016). In assessing the parties' proposed facts, the Court must not weigh the evidence or determine witness credibility; the Seventh Circuit instructs that "we leave those tasks to factfinders." *Berry v. Chicago Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010).

4.     **RELEVANT FACTS**

This Order resolves the Defendants' motion for summary judgment first. The facts relevant to that motion are discussed here, in a light most favorable to Plaintiffs. The facts relevant to Plaintiffs' motion for summary judgment are incorporated into the Court's analysis of that motion, *supra*, presented in a light most favorable to Defendants.

   **4.1     Background**

The parties in this case sell filtration systems designed to purify contaminated wastewater. Pro-Equipment, Inc. ("Pro-Equipment") is a global manufacturer, supplier, and reseller of such hardware and equipment and is based in Waukesha, Wisconsin. Douglas Hwang ("Hwang") owns Pro-Equipment and serves as its president. In 2014, Hwang formed Corncob, Inc. ("Corncob") to market and sell his now-patented wastewater treatment product called the Corncob II. This wastewater filtration product uses membrane discs that rotate in fluid

being moved by high pressure; it is an alternative to products that use tubular membranes.

Clark Engineering Corporation ("Clark Engineering") is an engineering firm offering a wide variety of engineering services and project management. In 2014, officers of Clark Engineering formed a separate business entity, Clark Technology, LLC ("Clark Technology"), that sells water and wastewater treatment systems as well as waste-to-energy systems. One of its products is a single-stage tubular membrane system sold under the brand name Leachbuster.

Dr. Abi Assadi ("Assadi") is Clark Engineering's and Clark Technology's president and CEO. Vladimir Scheglowski ("Scheglowski") is Clark Technology's executive vice president and COO, as well as a principal at Clark Engineering. Dr. Kazem Oskoui ("Oskoui") is a vice president and chief technology officer of Clark Technology and a senior associate at Clark Engineering. He had a relationship with Hwang of Pro-Equipment dating back to the 1990s, when he contacted Hwang about supplying equipment for treatment systems he was implementing internationally (before Oskoui joined Defendants' companies). Around 2006, Oskoui starting using tubular membranes in connection with wastewater treatment solutions and worked with Hwang and other suppliers to source and supply those projects. This eventually led to the creation of the Leachbuster. After Oskoui joined Clark Engineering in 2013, the company began marketing and selling the Leachbuster.

In 2013, Clark Engineering entered into discussions with Apex, a Minnesota company that offers project development, project management, and general contractor services to municipal and commercial clients for energy efficiency and environmental sustainability projects. Clark

Engineering and Apex contemplated working together on a number of projects, including a project to sell, install, and service a Leachbuster at a landfill in Kandiyohi County, Minnesota (the "Kandiyohi County Project"). Oskoui introduced Hwang to Clark Engineering's other management personnel as someone whose company, Pro-Equipment, could supply the equipment needed for the Kandiyohi County Project.

### 4.2    Alleged Oral Contract Between Pro-Equipment and Clark

Clark Engineering and Pro-Equipment entered into discussions about how to work together to provide the Leachbuster to customers. Plaintiffs say their discussions resulted in the formation of an oral contract, and Defendants disagree.

Specifically, Plaintiffs claim that

[i]n or about March or April 2013, Clark Engineering reached an enforceable oral agreement with Hwang and PEI. (ECF 41 at ¶18; Obermueller Decl., Ex. 6 at 79:22-80:11) Among other things, Hwang offered to Dr. Assadi and others to have Pro-Equipment manufacture certain equipment needed by Clark Engineering for its Leachbuster systems. (ECF 41 at ¶18) Clark Engineering was willing to have Pro-Equipment be a manufacturer in the United States provided that Hwang and Pro-Equipment would agree to supply Leachbuster systems each time when ordered by Clark Engineering, that Pro-Equipment would not manufacture or supply the proprietary Leachbuster system for, or sell such systems to, any person or company other than Clark Engineering, and that Pro-Equipment would maintain the confidentiality of Clark Engineering's confidential and proprietary information and strategies including its clients, and would not circumvent Clark Engineering by directly going to Clark Engineering's clients. (Obermueller Decl., Ex. 6 at 79:22-80:11; ECF 53-4, ¶¶ 2-9) Hwang and Clark Engineering also agreed that Pro Equipment will only supply equipment to Clark Engineering's customers through Clark Engineering, except with Clark Engineering's permission. (*Id*.) Hwang affirmed to Dr. Assadi and others that he and Pro-Equipment were

agreeable to these terms. (*Id*.) There was consideration for this agreement because of the mutual promises that the parties provided to each other, specifically, that Clark Engineering would use Pro-Equipment as a supplier/manufacturer in the United States and that Hwang and Pro-Equipment would comply with its above-referenced obligations. (*Id*.) The parties both initially performed under this agreement, although it was eventually breached by Hwang and Pro-Equipment.

(Docket #98 at 12).

The evidence on which Plaintiffs rely to support the existence of an oral contract includes a declaration by Assadi, (Docket #41), and deposition testimony of Scheglowski, (Docket #86-9).[1] Assadi testifies to the terms of the alleged contract as described above, with no more detail. For example, he does not specify a date on which the contract was made (he says "early 2013"). He says the contract involved promises about confidentiality, but he does not say that the parties defined what exactly constituted confidential information. He says Pro-Equipment agreed not to "circumvent" Clark Engineering by "directly going to Clark Engineering's clients," but he does not say whether the parties identified those clients. He also says nothing about the duration of the alleged contract. Assadi also attests that when Clark Technology was formed in 2015, Pro-Equipment

---

[1]Plaintiffs also cite to their own responses to Defendants' interrogatories, (Docket #53-4). That document includes the electronic signature of Plaintiffs' counsel as to the objections made therein, but no signature from any principal of Plaintiffs. *Id.* at 15. There is a verification page at the end of the document with a signature line for Clark Technology and Clark Engineering, but it is unsigned. *Id.* at 16. Therefore, no one from Clark Technology or Clark Engineering attested to the truth of the discovery responses. They are not evidence and will not be considered. In any event, the information contained in those responses does not add anything of substance to the other evidence on which Plaintiffs rely. Plaintiffs and their counsel are nonetheless cautioned that their litigation activities expend limited taxpayer resources, as well as those of the parties. This demands that they apply at least some measure of attention to detail in their work.

and Clark Technology entered into an oral agreement identical to the one between Pro-Equipment and Clark Engineering.

Scheglowski testified at his deposition that Clark Engineering and Pro-Equipment entered into an oral agreement in March or April 2013, and that Clark Technology was later made a party to that contract. The cited deposition testimony provides no other relevant details. In other portions of his deposition, Scheglowski explains that Hwang operated "the old-fashioned way" with a handshake instead of formal written agreement. (Docket #86-9 at 10). Scheglowski said that Hwang and Oskoui had a "longstanding relationship," and Clark Engineering relied on that relationship as "what we went by." *Id.* at 10–11.

Defendants contend that no oral agreement was ever reached. Hwang attests that the 2013 discussions between Pro-Equipment and Clark Engineering were planning discussions.

Toward the end of 2013, Clark Engineering provided Pro-Equipment with a draft memorandum of understanding ("MOU"), dated October 31, 2013, regarding the two entities' working relationship in connection with projects. (Docket #53-5 at 3–8). The preamble language of the MOU states that "[t]he parties desire to document their relationship within a legal framework, specifying each party's rights and obligations" and "this MOU . . . shall be considered as the foundation to all further stages of their joint cooperation." *Id.* at 3. The MOU includes specific contractual terms, such as the types of projects its covers, the obligations of each party in preparing proposals and orders, payments and fees, and the duration of the agreement. It also includes a provision specifying that any proposals or bids for additional work from Clark Engineering's existing clients would be run through Clark Engineering. *Id.* at 5. Pro-Equipment rejected the MOU as

written and provided a counter-proposal. Clark Engineering did not accept Pro-Equipment's counter-proposal.

### 4.3     The Kandiyohi County Project

During 2014, Apex and Clark Engineering worked together on developing the Kandiyohi County Project. The prime contract for the project was between Apex and Kandiyohi County. Apex then signed a subcontract with Clark Engineering dated November 14, 2014 to purchase a Leachbuster unit. On March 24, 2015, Clark Engineering and Pro-Equipment entered into a written contract for Pro-Equipment to supply the hardware for that Leachbuster unit.

The parties agree that the contract is comprised of a written proposal sent by Pro-Equipment to Clark Engineering on March 24, 2015 and invoices sent to and paid by Clark Engineering. The parties also agree that the equipment that Pro-Equipment supplied for the Leachbuster system at Kandiyohi County has always performed as represented, warranted, and guaranteed by Pro-Equipment to Clark Engineering.

### 4.4     The NSC/Michael Foods Project

In 2015, Apex learned of Michael Foods as a prospect for the installation of a wastewater treatment system during a meeting with the Metropolitan Council, a public entity in the Minneapolis–St. Paul area. Seth DeGeest of Apex contacted Michael Foods by email and forwarded detailed information about the Leachbuster and the Kandiyohi County Project. In December 2015, Apex and Clark Technology began to develop plans for the possible Michael Foods project. On August 18, 2016, Apex and Clark Technology entered into a "study subcontract" regarding the preparation of a study "that would review the feasibility of using a Leachbuster at

Michael Foods and could, later, lead to a larger project involving the sale of a Leachbuster system." (Docket #98 at 36).

In November 2017, Michael Foods entered into a contract with Apex for the installation of a wastewater treatment system. That contract did not require that a Leachbuster system be installed. While Clark Technology had done testing according to the terms of the study subcontract, that subcontract did not guarantee that a Leachbuster would be used for the Michael Foods contract.

Ultimately, Michael Foods decided to install a Corncob II system, not a Leachbuster. The parties dispute some of the facts that led to this result, but those disputes are not material to the resolution of the instant motion. Briefly, Defendants say that during the development of the Michael Foods project, Apex began having serious concerns about the efficacy of the Leachbuster system installed in Kandiyohi County, the accuracy of Clark Technology's reporting about operations at that project, and Clark Technology's inability to provide necessary details about scope and price for the Michael Foods project. As a result, Defendants say, Apex decided to explore alternative providers for the wastewater system and, in January 2018, requested a proposal from Corncob. Apex then presented Michael Foods with both the Corncob II and the Leachbuster as options, and Michael Foods picked the former.

The Plaintiffs tell the story differently. They say Apex made up its purported "concerns" regarding the Kandiyohi County Project so that it could switch from the Leachbuster to the Corncob II for the Michael Foods Project and "make a lot more money." (Docket #98 at 39). Plaintiffs explain that in September 2017, Apex obtained a bid for Corncob II for a project in Monroe County, Wisconsin, which resulted in Apex saving approximately

fifty percent in equipment costs relative to the bid it had received from Clark Technology. Apex then began calculating how much it could make by substituting a Corncob II system for the Leachbuster system for the Michael Foods Project. Apex got a bid from Corncob, and it was significantly lower than the amount Clark Technology had bid for the Michael Foods job.

Plaintiffs accuse Corncob, Pro-Equipment, and Apex of then conspiring to create a new proposal for the Michael Foods project that inflated Corncob's real price by $1.6 million, with the understanding that Corncob and Pro-Equipment would kick back to Apex a significant amount of this unearned profit if Michael Foods picked them. *See* (Docket #98 at 39–40). Defendants argue this story is based only on speculation. *Id.* at 40.

### 4.5 The Monroe County Project

Turning back the clock a bit, on July 25, 2017, Clark Technology submitted a proposal to Apex for installation of another Leachbuster system, this time in Monroe County, Wisconsin (the "Monroe County Project"). The cost for the proposed system was $825,000. This price was non-negotiable. Plaintiffs claim that Apex sabotaged their bid for the project by adding nearly $900,000 on top of Clark Technology's proposal and then telling Monroe County that the project would cost $2 million. Rather than decrease its own profits, Apex used the county's concern regarding the overall project price as an excuse to "rebid" the project—*i.e.*, get a bid from Corncob that undercut Clark Technology's bid.

On or around September 19, 2017, Corncob submitted a proposal to Apex for installation of a Corncob II for the Monroe County Project. The cost was $389,000. Apex accepted that proposal and entered into a subcontract with Corncob.

On October 16, 2017, Assadi sent Hwang an email that stated in part, "We value our relationship. I do not think it is a good idea for you to directly work with Apex. That sets a bad path for future, our relationship, and the protection of Clark's IP[]." (Docket #51-4 at 2). Hwang responded on behalf of Pro-Equipment by saying, "Yes, we value our long history of relationship and would like you to know we are not working with Apex nor offering them Leachbuster, even though we don't have signed agreement. We see this as ethical considerations." *Id.*

On November 30, 2017, Hwang sent an email to Corncob employees summarizing a discussion he had with Assadi, saying "I made it clear that PEI [Pro-Equipment] is not providing Leachbuster to Apex[]." Assadi testifies that later that same month, he and Scheglowski met with Hwang and presented their concern that Apex was trying to circumvent the Clark companies by working directly with Hwang and his companies. Assadi states that

> [b]oth Vlad Scheglowski and I expressed our understanding that Douglas Hwang had previously agreed that he would not work with Apex or any other of Clarks' customers, except through one of the Clark entities. Douglas Hwang acknowledged the parties' prior agreement and told us that he understood that he and his companies could not work directly with Apex and that he did not intend to do so. Douglas Hwang also told us that if he ever wanted to work directly with Apex on a specific project, he would ask for written permission or a waiver from us before he or his companies would work directly with Apex on that project.

(Docket #41 at 3). On December 6, 2017, Assadi sent Hwang an email thanking him "for meeting with us and setting the record straight and the fact that you will ask for written waiver/permission from Clark to work directly with Apex for a particular or any project. That means a lot to us and

we appreciate it." *Id.* at 3–4. Hwang responded and did not object to Assadi's characterization of the conversation.

### 4.6 Further Attempts to Execute Written Contracts

On February 7, 2018, Clark Engineering sent Pro-Equipment a proposed mutual non-disclosure agreement backdated to January 1, 2017. Scheglowski testified that his intention, as a layperson, was to memorialize prior agreements that existed between the parties. The agreement was never signed.

Shortly thereafter, on February 9, 2018, Clark Technology sent Pro-Equipment a proposed mutual non-disclosure and confidentiality agreement backdated to January 2, 2015, and Clark Engineering sent Pro-Equipment a proposed mutual non-disclosure agreement dated July 1, 2013. In addition to being backdated, these agreements purported to be with Hwang as an individual along with any of his related companies. Also on February 9, Assadi sent Pro-Equipment an email stating "we need to honor our words, handshakes" and directed that Clark Technology and Clark Engineering needed Pro-Equipment to sign the agreements that day. Neither Pro-Equipment (nor Corncob) signed those agreements.

### 4.7 Corncob's Advertising

Around 2016, Corncob began promoting its Corncob II system. In promotional material for this system, Corncob included information about the wastewater treatment equipment used in the Kandiyohi County Project and another project in South Dakota, both of which involved Leachbusters. Pro-Equipment had supplied some equipment for those projects. In its advertisements, Corncob made up a different brand name for the system in those projects, the Corncob I, but used images of the Leachbuster and the Leachbuster trademark.

5.     **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

The majority of the parties' briefing on Defendants' summary judgment motion is dedicated to the four claims Plaintiffs recently sought to voluntarily dismiss: breach of contract (Count IV), breach of the duty of good faith and fair dealing (Count V), tortious interference with contract or prospective contractual relationship (Count VI), and contractual indemnification (Count VII). (Docket #1). These claims are without merit and must be dismissed. This is unsurprising, given that Plaintiffs conceded in their motion to dismiss that they cannot meaningfully advance these claims anymore. Plaintiffs' remaining claims, based on a violations of the Lanham Act (Counts I and II) and the Deceptive Trade Practices Act (Count III), are also without merit. They will be dismissed as well.

**5.1     Breach of Contract**

Plaintiffs claim that they entered into binding oral contracts with Defendants in 2013 and 2015 that included non-circumvention and confidentiality clauses, and that Defendants breached those agreements by working directly with Apex on the Michael Foods project. Defendants claim no such contracts were ever made.

An enforceable oral contract requires a meeting of the minds between the parties with respect to the essential terms of the agreement and mutual intent to be bound. *Larimer v. Dayton Hudson Corp.,* 137 F.3d 497, 502 (7th Cir. 1998) (citing *Witt v. Realist, Inc.,* 118 N.W. 85, 93 (Wis. 1962); *see also Ziolkowski v. Caterpillar, Inc.,* 800 F. Supp. 767, 779 (E.D. Wis. 1992) *aff'd,* 996 F.2d 1220 (7th Cir. 1993)). In addition, the material terms must be "definite and certain" to be enforceable. *Superview Network, Inc. v. SuperAmerica, a Div. of Ashland Oil, Inc.,* 827 F. Supp. 1392, 1396 (E.D. Wis. 1993); *Herder*

*Hallmark Consultants, Inc. v. Regnier Consulting Grp., Inc.,* 685 N.W.2d 564, 566 (Wis. Ct. App. 2004).

To determine if the parties intended to be bound by an oral agreement, the court undertakes an objective analysis. Effect is given to the parties' intent to contract "if such intent is discernible from their conduct or the contract language." *Herder,* 685 N.W.2d at 566; *Skycom Corp. v. Telstar Corp.,* 813 F.2d 810, 814 (7th Cir. 1987) (determining a party's intent "does not invite a tour through [a plaintiff's] cranium, with [the plaintiff] as the guide") (quotations omitted); *Colfax Envelope Corp. v. Local No. 458–3M, Chicago Graphic Commc'ns Int'l Union, AFL–CIO,* 20 F.3d 750, 752 (7th Cir. 1994) ("[A] literal meeting of the minds is not required for an enforceable contract, which is fortunate, since courts are not renowned as mind readers."). If the subjective intent of one party could unilaterally bind another to an oral contract, parties may become wary to enter into negotiations for fear of unwittingly "agreeing" to a deal. *Skycom,* 813 F.2d at 814.

Even viewing the evidence favorably to Plaintiffs, the only reasonable conclusion is that the parties did not reach an agreement in 2013 or 2015 regarding their ongoing relationship. The evidence demonstrates that Clark Engineering and Pro-Equipment based their working relationship on a vague gentleman's agreement (or "golden handshake," as Oskoui called it) between Hwang and Oskoui that predated Oskoui joining Clark Engineering. This gentleman's agreement did not have specific terms; it was based on mutual respect or, to borrow a term from one of Hwang's emails, "ethical considerations." Plaintiffs could have insisted that the vague understanding between Hwang and Oskoui be reduced to an enforceable agreement, but they decided to rely on trust instead.

The parties' various failed attempts to enter into a written contract—with the MOU in 2013 and the non-disclosure agreements in 2018—reveal that no sufficiently definite agreement was ever formed. *See Ziolkowski*, 800 F. Supp. at 779 ("it is apparent from the continuing negotiations generated by Ziolkowski that there was no mutual assent to the terms of the agreement and that the terms of the agreement were not definite or certain or complete."). The parties' discussions surrounding the scope of their relationship amounted, at most, to an agreement to later agree to work on specific projects together. Under Wisconsin law, such "agreements to agree" do not create binding obligations. *Witt*, 118 N.W.2d at 93–94 ("Mere agreements to reach a contract in the future are not enforceable."). Where parties do not intend to be bound until all negotiations are complete, no contract is formed. *Gruen Indus., Inc. v. Biller*, 608 F.2d 274, 280 (7th Cir. 1979) ("It is well settled that no contract is formed 'where two parties consider the details of a proposed agreement, perhaps settling them one by one, with the understanding during this process that the agreement is to be embodied in a formal written document and that neither party is to be bound until he executes the document.'") (citing 1 A. Corbin, Contracts § 30 at 97 (1973 ed.)).

In addition to their being no mutual intent to be bound, the alleged agreements are not sufficiently definite and certain to be enforceable. There was no meeting of the minds on a number of essential contract terms. Apart from Assadi's declaration, there is absolutely no evidence establishing the existence of the specific terms to which he says the parties agreed. And even if the Court credits, as it must, Assadi's testimony that Pro-Equipment agreed to, *inter alia*, maintain the confidentiality of Clark Engineering's confidential information and not supply equipment to customers of Clark

Engineering except through Clark Engineering, there remain gaping holes in the alleged agreement's essential terms. For example, there is no evidence about the start or end date of the contract, the identities of the customers with whom Pro-Equipment was agreeing not to transact, or the definition of the confidential information meant to be kept secret.

Finally, the various emails cited in the parties' factual briefing do not compel the conclusion that a contract existed. For example, Assadi wrote to Hwang on October 16, 2017 saying "I do not think it is a good idea for you to directly work with Apex," and Hwang responded that "we are not working with Apex nor offering them Leachbuster, even though we don't have signed agreement. We see this as ethical considerations." (Docket #51-4 at 2). Interpreting this exchange favorably to Plaintiffs, Hwang was misleading Assadi about working with Apex. But he unmistakably states that he does not believe the parties have an enforceable agreement, and that his (fabricated) avoidance of Apex was compelled by virtue, not by contract.

Assadi's December 6, 2017 email to Hwang, purportedly memorializing a meeting between Assadi, Hwang, and Scheglowski, is slightly more persuasive for Plaintiffs' case, but ultimately not enough to create a jury question. In that email, Assadi thanked Hwang for "setting the record straight and the fact that you will ask for written waiver/permission from Clark to work directly with Apex for a particular or any project," (Docket #41 at 3–4), and Hwang responded without objection. This piece of evidence could support Plaintiffs' contention that the parties understood Pro-Equipment was not supposed to work with Apex directly. Even so, this evidence buttresses just one term of an alleged agreement. The other essential terms remain without support.

Based on the undisputed evidence in the record, no reasonable factfinder could conclude that the parties reached an agreement on the essential terms of a contract in 2013 or 2015.[2] Plaintiffs' breach of contract claim, Count IV, will be dismissed.

### 5.2    Breach of Duty of Good Faith and Fair Dealing

Plaintiffs next claim that Pro-Equipment breached its duty of good faith and fair dealing in its alleged agreements with Clark Technology by attempting to circumvent and cut Plaintiffs out of the Michael Foods Project, the Monroe County Project, and "likely other projects," knowing that "the projects had been secured in large part because of Plaintiffs' efforts." (Docket #1 at 26).

Under well-established Wisconsin law there can be no claim for breach of the implied duty of good faith and fair dealing without an enforceable contract. *Tabatabai v. W. Coast Life Ins. Co.*, 664 F.3d 663, 668 (7th Cir. 2011) (citing *NII–JII Entm't, LLC v. Troha,* 736 N.W.2d 542 (Wis. Ct. App. 2007)). Having found that the parties did not have an enforceable agreement, this claim must also fail. Count V will be dismissed.

### 5.3    Tortious Interference

Plaintiffs next claim that Defendants intentionally interfered with their contractual relationships or prospective contractual relationships with Apex, Michael Foods, and Monroe County.

In Wisconsin, interference with a present or prospective contractual relationship requires proof of the following five elements: "(1) the plaintiff had a contract or prospective contractual relationship with a third party; (2) the defendant interfered with the relationship; (3) the interference was

---

[2]Because the Court finds the alleged agreements unenforceable, it need not reach Defendants' alternative argument that their purported breach did not cause any damages. (Docket #48 at 13–15).

intentional; (4) a causal connection exists between the interference and the damages; and (5) the defendant was not justified or privileged to interfere." *Burbank Grease Servs., LLC v. Sokolowski*, 717 N.W.2d 781, 796 (Wis. 2006). A prospective contract must be "sufficiently certain, concrete and definite." *Quad/Graphics, Inc. v. One2One Commc'ns, LLC*, 529 F. App'x 784, 790 (7th Cir. 2013).

As to Plaintiffs' claim that Defendants interfered with their prospective contracts with Monroe County and Michael Foods, the claim fails on the very first element. There is no evidence in the record to establish that Plaintiffs had a contract or prospective contract with either of those entities. For the Monroe County Project, the prime contract ran between Apex and Monroe County. True, Plaintiffs submitted a bid to Apex for the installation of a Leachbuster system at the Monroe County Project; but even if Monroe County had elected to use a Leachbuster, Plaintiffs' contract for the project would have been with Apex, not Monroe County.

The same is true with Michael Foods. For that project, Apex and Clark Technology entered into a study subcontract to review the feasibility of using a Leachbuster at Michael Foods. This contract did not involve Michael Foods as a party. Then in November 2017, Michael Foods entered into a contract with Apex for the installation of a wastewater treatment system (not specifically a Leachbuster system). Clark Technology was not a party to that contract, or even an intended beneficiary of the contract. While Clark Technology had done testing according to the terms of the study subcontract, it did not guarantee that a Leachbuster would ultimately be used for the Michael Foods contract. And again, even if Michael Foods had chosen to install a Leachbuster, Plaintiffs' contract would have been with Apex, not Michael Foods.

Finally, Plaintiffs contend that they had up to three different contracts or prospective contracts with Apex with which Defendants interfered. None are supported by evidence. First, Plaintiffs claim to have had an oral contract with Apex under which Apex agreed not to work with Defendants without Plaintiffs' permission. The evidence Plaintiffs cite for this is an email by Hwang—not by any principal from Plaintiffs or Apex—expressing his apparent understanding that "Apex and Clarke (sic) have an agreement . . . which does not allow Apex and [Pro-Equipment] to work with each other directly without permissions from Clarke (sic)." (Docket #83 at 20). Hwang's belief about a single term of an alleged contract between Plaintiffs and Apex is not enough to establish the existence of a contract.

Plaintiffs also claim to have had prospective contracts with Apex for the installation of a Leachbuster at each of the Monroe County and Michael Foods projects. For these projects, Clark Technology has put forward evidence that it was a bidder for the job. However, Clark's bid proposal was not selected. Further, the agreements between Apex and Monroe County and Apex and Michael Foods did not require use of a Leachbuster. In other words, there is not sufficient evidence to demonstrate that Clark Technology had a reasonably definite prospective contract with Apex to install Leachbusters at those projects. Finally, even if Plaintiffs are right that Apex purposely tanked Clark Technology's proposal for the Monroe County and Michael Foods projects so that it could make a bigger profit by going with Corncob, Plaintiffs' injury would stem from Apex, not Defendants.

In light of the foregoing, Plaintiff's tortious interference claim, Count VI, will be dismissed.

### 5.4 Breach of Warranty and Contractual Indemnification

Plaintiffs allege as part of Count IV that Defendants have breached warranties made by Pro-Equipment to Clark Engineering related to equipment Pro-Equipment supplied for the Kandiyohi County Project. Similarly, in Count VII, Plaintiffs claim to be entitled to "contractual indemnification" because of defects in the equipment, materials, or other work supplied by Pro-Equipment in connection with the Kandiyohi County Project.

Plaintiffs concede these claims should be dismissed, but they argue the dismissal should be without prejudice. They pled these claims based on their "reasonable belief" and Apex's "overt threat" that Apex intended to immediately sue Plaintiffs in connection with the Kandiyohi County Project. (Docket #83 at 29). Apex "has chosen (up to this point) to refrain from bringing that lawsuit," and therefore, Plaintiffs argue, their claims are "not ripe" and "rest upon the 'contingent future events' (i.e. Apex suing Plaintiffs in connection with the Kandiyohi County Project), meaning the Court lacks subject matter jurisdiction." *Id.* (citing *Texas v. United States*, 523 U.S. 296, 300 (1998)).

The ripeness of Plaintiffs' claims does not depend on Apex filing a lawsuit. The quality of the equipment Defendants supplied to Clark Engineering will not change if or when Apex files a lawsuit; if Defendants have breached any warranty or contract due to defective products, that injury took root when Defendants supplied the products. The Court will not bite on Plaintiffs' invitation to decline ruling on their warranty and indemnification claims.

These claims are resolved easily on the undisputed facts. Plaintiffs admit that the equipment Pro-Equipment supplied for the Kandiyohi

County Project "has always performed as represented, warranted and guaranteed by Pro-Equipment." (Docket #98 at 21). Therefore, their warranty and indemnification claims in Counts IV and VII will be dismissed.

### 5.5 Lanham Act

Counts I and II of the complaint allege a violation of the Lanham Act, 15 U.S.C. § 1125(a), for false advertising. The complaint inexplicably splits this claim into two counts, with Count I seeking money damages and Count II seeking injunctive relief, but both are predicted on the same operative facts. Plaintiffs allege that Corncob falsely advertised a product called the Corncob I by claiming in advertising materials that images depicting the Leachbuster system were actually a Corncob I system. Corncob did this, Plaintiffs say, with the intention of deceiving potential wastewater treatment system customers into believing that Corncob has more experience than it actually does, and that its Corncob II system is an improved model. For its part, Corncob says it did this to avoid using the Leachbuster trademark in its promotional materials without permission.

In response to Defendants' summary judgment motion, Plaintiffs argue for the first time that Corncob also violated the Lanham Act based on an entirely different alleged misrepresentation. Plaintiffs claim Defendants and Apex misled Michael Foods about the respective costs of the Corncob II and Leachbuster in an effort to convince Michael Foods to choose the Corncob II. (Docket #83-1 at 24–27). In other words, Plaintiffs add an entirely new factual basis to their Lanham Act claim. This is unacceptable. While a plaintiff may raise new legal theories not expressed in a complaint, it cannot add new factual bases for its claims in response to summary judgment. *See Whitaker v. Milwaukee Cty., Wis.,* 772 F.3d 802, 808 (7th Cir.

2014). That is precisely what Plaintiffs seek to do with their newly-crafted Lanham Act claim. The Court will not consider factual bases for Plaintiffs' Lanham Act claim not pled in the complaint. *See* (Docket #83-1 at 24–27).[3]

To prevail on a deceptive advertising claim under the Lanham Act, a plaintiff must prove that "(1) the defendant made a material false statement of fact in a commercial advertisement; (2) the false statement actually deceived or had the tendency to deceive a substantial segment of its audience; and (3) the plaintiff has been or is likely to be injured as a result of the false statement." *Eli Lilly & Co. v. Arla Foods, Inc.*, 893 F.3d 375, 381–82 (7th Cir. 2018) (citing *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 819 (7th Cir. 1999)).

The parties address only the causation element; that is, whether Plaintiffs can prove that they suffered an injury caused by Corncob's false advertising. Satisfying this element "requires proof of an injury to a commercial interest in sales or business reputation proximately caused by the defendant's misrepresentations." *Id.* at 383 (citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014)). This type of injury "occurs when deception of consumers causes them to withhold trade from the plaintiff." *Lexmark Int'l*, 572 U.S. at 133.

---

[3]This tactic is especially disappointing given that, in their briefing on their own summary judgment motion, Plaintiffs chide Defendants for "rais[ing] an unpled theory . . . for the first time in response to a summary judgment motion." (Docket #93 at 2) (citation omitted). Plaintiffs remind the Court that "[a]lthough . . . a plaintiff need not allege every fact in support of its claim, the Seventh Circuit has held that it is 'vitally important' that the complaint 'inform the opposing party of the grounds upon which a claim rests' and that 'a complaint is adequate only if it fairly notifies a defendant of the matters sought to be litigated.'" *Id.* at 2–3 (quoting *Connor v. Ill. Dep't of Nat'l Res.*, 413 F.3d 675, 679 (7th Cir. 2005)) (internal quotation mark omitted). Plaintiffs, yet again, seem determined to advance arguments that do them more harm than good.

Defendants argue that Plaintiffs cannot prove a likely injury, much less actual damages, caused by the Corncob I advertisements, and therefore Plaintiffs are not entitled to any money damages. It is undisputed that Corncob has sold only two Corncob II systems, and only to Apex: one for the Monroe County Project and one for the Michael Foods Project. (Docket #98 at 48). Of course, Apex is no stranger to either Plaintiffs or Defendants; it knew that the system installed in Kandiyohi County was a Leachbuster, not a "Corncob I" as it was titled in Corncob's deceptive advertisement. There is no evidence that Apex chose the Corncob II because of the advertisements at issue. There is also no evidence that any other company, including an end-user customer such as Monroe County or Michael Foods, ever saw the advertisements in question or were influenced by them.

Plaintiffs state in a conclusory fashion that "the evidence and reasonable inferences show that Defendants' advertising and other false statements of fact caused [Michael Foods] to withhold trade from Plaintiffs—i.e., to switch from purchasing the Leachbuster® system that [Michael Foods] intended to buy when it signed its contract with Apex, to instead purchase Defendants' Corncob II system." (Docket #83-1 at 23). But they cite no evidence for this proposition that connects the Corncob I advertisements (the only false advertisements at issue) to Michael Foods' decision.

Plaintiffs instead point to facts surrounding the negotiations between Corncob, Apex, and Michael Foods, which Plaintiffs have characterized as a conspiracy based on lies intended to deceive Michael Foods about the relative cost of the Corncob II and the Leachbuster. But, as explained above, these facts were not alleged in the complaint as a basis for Lanham Act liability, and they will not be considered. Even if the Court

were to consider them, they would not change the result. Plaintiffs allege that Defendants misled Michael Foods while pitching their product directly to Michael Foods in private negotiations. This is not "commercial advertising or promotion," an essential ingredient of any claim under Section 43(a)(1)(B). *First Health Grp. Corp. v. BCE Emergis Corp.*, 269 F.3d 800, 803 (7th Cir. 2001).

Plaintiffs have not created a jury question on the causation element of their Lanham Act claim, and therefore the claim fails. This conclusion means Plaintiffs are entitled to neither money damages *nor* an injunction. This is true despite the fact that Defendants, in their summary judgment submission, consented to entry of a permanent injunction including the following proposed terms:

> Pro-Equipment, Inc. and Corncob, Inc., along with their respective owners, successors, affiliates and assigns, are hereby permanently enjoined from:
>
> 1.      Using, or instructing or requesting a third party to use, the brand name Corncob I in connection with any communication, advertising, promotion, or sale of any product;
>
> 2.      Associating, or instructing or requesting a third party to associate, Corncob, Inc. or the Corncob II product with the products sold under the Leachbuster® trademark or projects where a Leachbuster® system was installed, in any communication or promotional material.

(Docket #48-1).[4]

---

[4]Defendants also state that they have already made "wholesale changes" to their advertising in an attempt to address Plaintiffs' allegations. (Docket #48 at 26). Specifically, Defendants "have taken steps to remove photos of the system at Kandiyohi County, have taken down all videos from its websites that contained the statements at issue in the Complaint, and tried to eliminate all references to a Corncob I system." *Id.*

A permanent injunction is a remedy for a violation of the Act; there can be no such remedy without liability. In other words, the Court cannot grant Plaintiffs permanent injunctive relief without having found that Defendants violated the Act. *See* 15 U.S.C. § 1116 (authorizing district courts to enter injunctive relief in false advertising cases); *see also* 5 McCarthy on Trademarks § 30:1 (4th ed. 2012) (an injunction is "the usual and standard remedy once [a violation] has been found."). Because there is no Lanham Act violation in this case, the Court will not enter a permanent injunction.[5]

### 5.6    Wisconsin Deceptive Trade Practices Act

Plaintiffs' final claim alleges a violation of the Wisconsin Deceptive Trade Practices Act ("WDTPA"). Wis. Stat. § 100.18. The factual allegations on which Plaintiffs base this claim are the same as those underlying the Lanham Act claim: Corncob advertised its Corncob II system to the public in a false and deceiving manner. (Docket #1 at 23).

---

[5]One final, related, point of confusion on the Lanham Act claim must be noted. In a footnote in their summary judgment response brief, Plaintiffs state that

> Defendants did not seek summary judgment on Plaintiffs' other claims for injunctive relief, including, without limitation, Plaintiffs request that Defendant be enjoined from (a) working with or for Apex on the Monroe County Project, the Michael Foods Project, or the Kandiyohi County Project, except as a subcontractor to Plaintiffs; (b) selling the purported Corncob I product; (c) making claims that directly or indirectly indicate or imply that Corncob II is a variant, alternative or "next generation" version of Corncob I or the Leachbuster® system; or (d) requiring Defendants to engage in corrective advertising to remedy their historical and current false advertising. (ECF 1 at 16-23, 29; ECF 48 at 26) As a result, Plaintiffs have not addressed the merits of these claims in their response to Defendants' Motion.

(Docket #83-1 at 23, n.10). The enumerated items in Plaintiffs' footnoted laundry list are not "claims." They are desired remedies for a violation of the Act. As explained above, there is no Lanham Act liability in this case, so Plaintiffs are entitled to no relief on that claim.

As with their Lanham Act claim, Plaintiffs attempt to add new factual allegations to their WDTPA claim in their response brief that were not alleged in their complaint. In fact, the section of Plaintiffs' brief discussing their WDTPA claim abandons altogether the facts alleged in the complaint. Instead, Plaintiffs now base their claim on Hwang's alleged misrepresentations to them that Pro-Equipment was an original equipment manufacturer of wastewater treatment systems, as opposed to a reseller. (Docket #83-1 at 28–29). This new factual basis will not be considered. *Whitaker*, 772 F.3d at 808.

The purpose of the WDTPA "is to deter sellers from making false and misleading representations in order to protect the public." *Novell v. Migliaccio*, 749 N.W.2d 544, 550 (Wis. 2008). Toward that end, Section 100.18 prohibits the use of marketing statements for products or services which "contain[] any assertion, representation or statement of fact which is untrue, deceptive or misleading." Wis. Stat. § 100.18(1). A cause of action pursuant to Section 100.18 requires proof of three elements: "(1) the defendant made a representation to the public with the intent to induce an obligation, (2) the representation was 'untrue, deceptive or misleading,' and (3) the representation materially induced (caused) a pecuniary loss to the plaintiff." *Novell*, 749 N.W.2d at 553.

As explained above with respect to the Lanham Act claim, Plaintiffs have presented no evidence of loss caused by the offending advertisements. Plaintiffs' failure to establish any injury from Corncob's false advertising dooms their WDTPA claim, just as it did their Lanham Act claim.

In addition, Section 100.18(1) "does not provide a cause of action for one vendor against a competitor for representations the competitor made to third parties." *Grice Eng'g, Inc. v. JG Innovations, Inc.*, 691 F. Supp. 2d 915,

922 (W.D. Wis. 2010); *see also Spacesaver Corp. v. Marvel Group, Inc.*, 621 F. Supp. 2d 659, 663–64 (W.D. Wis. 2009) ("[I]f § 100.18 extends to misrepresentations made to nonparties, application of the statute becomes almost nonsensical."). A WDTPA plaintiff must be a member of the "public" or, at least, of the audience to whom the misrepresentation is directed, to bring a claim under Wis. Stat. § 100.18(1). Here, Plaintiffs have not adduced facts to create a jury question as to whether they—or anyone, for that matter—were misled by Corncob's advertisements containing the Leachbuster falsely labeled as a Corncob I. Accordingly, Defendants are entitled to summary judgment on Plaintiffs' WDTPA claim.

**6.     PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

The Court turns now to Plaintiffs' motion for summary judgment, which seeks dismissal of Defendants' counterclaims for: abuse of process, civil conspiracy, and tortious interference with prospective contractual relations. (Docket #16, Counterclaims; Docket #38, Motion for Summary Judgment). Defendants abandoned the latter two claims with prejudice in response to Plaintiffs' motion, (Docket #78-1 at 4), and therefore only Plaintiff's abuse of process claim remains.[6]

---

[6]Defendants explain that they concede Counts II and III of their counterclaims "[i]n the interest of judicial efficiency" because all three counterclaims "arise from similar facts and overlap." (Docket #78-1 at 4). As the parties well know from the Court's earlier order regarding Plaintiffs' motion to voluntarily dismiss, *see* (Docket #63), voluntary dismissal at this stage of proceedings is not automatic. In this instance, though, Plaintiffs' reply brief acknowledges Defendants' concession of their counterclaims and addresses only Defendants' abuse of process claim. (Docket #93). In other words, Plaintiffs consent to dismissal of counterclaims Counts II and III. Further, Defendants' concession will result in judgment on the merits. Therefore, summary judgment in favor of Plaintiffs on Defendants' Counts II and III is appropriate, and the Court will dismiss those counts with prejudice.

Defendants allege that Clark Engineering and Clark Technology filed their complaint in this case for an improper reason—to coerce Corncob to "forgo its lawful ability to compete and sell its patented advanced membrane filtration system for wastewater to anybody" and, more specifically, to coerce Corncob to "forgo its lawful ability to contract with Apex Efficiency Solutions" on the Michael Foods Project. (Docket #16 at 55). Defendants claim that Plaintiffs filed their suit knowing that public funding for the Michael Foods Project would likely be withdrawn if any litigation commenced. *Id.*

The parties present and bicker about numerous proposed findings of fact on this claim, but only a few are truly relevant. In Defendants' view, Plaintiffs started this lawsuit to stop the Michael Foods Project from going forward without them and, knowing Defendants' business is small, to hurt their business by draining their resources. *See* (Docket #79-1 at 4–5). Assadi's testimony suggests this might be true. *Id.* at 4. Defendants also claim that another reason Plaintiffs sued was to obtain a tactical advantage in the Minnesota litigation based on, in Hwang's words, "psychological factor[s]" and "the timing and the content." *Id.* at 5.

Defendants' proposed facts also venture into examples of Plaintiffs' use (or abuse) of the litigation process *after* the filing of the complaint, which is the basis on which Defendants brought their counterclaim. For example, Defendants contend that Plaintiffs "used the pendency of this lawsuit and the Minnesota Litigation to attempt to manipulate the rules of discovery" by "subpoena[ing] deposition testimony from Defendants' principal, Douglas Hwang, after the Complaint was filed in this Court but before discovery had opened," thereby seeking "early discovery related to this case" through the Minnesota litigation. (Docket #92 at 4). They also contend

that Plaintiffs abused the process of depositions in this case to obtain information from deponents that gave them an advantage in the Minnesota litigation. *Id.* at 7. Finally, Defendants also propose facts related to Plaintiffs' motion to voluntarily dismiss, which the Court discussed at length above. Defendants contend that Plaintiffs' concession that they cannot meaningfully prosecute several of their claims at this stage is evidence that Plaintiffs have abused the judicial process.

Defendants based their abuse of process claim on the filing of this lawsuit, so no subsequent "process" is at issue here. If Defendants believed the issuance of a certain subpoena was an abuse of the subpoena process, for example, they could have amended their complaint to say so. That is not to say that Plaintiffs' conduct in this lawsuit after filing the complaint is not relevant at all. Such conduct may prove probative in determining whether Plaintiffs intended to abuse process by filing the lawsuit in the first place. *See Schmit v. Klumpyan*, 663 N.W.2d 331, 336, n.3 (Wis. Ct. App. 2003). But the Court will limit its analysis to determine whether Defendants may proceed on their claim as pled—that by "filing this lawsuit," Clark Engineering and Clark Technology "are misusing the process to accomplish a purpose other than that it was designed to accomplish." (Docket #16 at 55).

In Wisconsin, a claim for abuse of process has two elements: "(1) a purpose other than that which the process was designed to accomplish, and (2) a subsequent misuse of the process." *Strid v. Converse*, 331 N.W.2d 350, 355 (Wis. 1983). Success on the claim requires proving more than "a proper use with a bad motive. The plaintiff must allege and prove that something was done under the process which was not warranted by its terms." *Id.* (quotation omitted); *see also Thompson v. Beecham*, 241 N.W.2d 163, 166 (Wis.

1976) ("[T]here is no liability where the defendant has done nothing more than carry out the process to its authorized conclusion, even though with bad intentions.").

Wisconsin courts characterize the tort as "an attempt to use process as a means of extortion." *Schmit*, 663 N.W.2d at 335 (citation omitted). An early decision of the Wisconsin Supreme Court clarifies that the inquiry is "'whether the process has been used to accomplish some unlawful end, or to compel the defendant to do some collateral thing which he would not legally be compelled to do.'" *Id.* (quoting *Docter v. Riedel,* 96 Wis. 158, 161, 71 N.W. 119 (Wis. 1897)). The classic example of an abuse of process is the initiation of a civil proceeding to coerce the payment of a debt completely unrelated to the cause of action sued upon. *Sweeney v. Flanagan,* 1996 WL 414170, at *1 (7th Cir. July 23, 1996) (unpublished disposition) (quoting Restatement (Second) of Torts § 682 cmt. b)). "Because of its potential chilling effect on the right of access to the courts, the tort of abuse of process is disfavored and must be narrowly construed to insure the individual a fair opportunity to present his or her claim." *Wisconsin Pub. Serv. Corp. v. Andrews*, 766 N.W.2d 232, 237–38 (Wis. Ct. App. 2009) (quotation omitted).

Wisconsin courts have found viable abuse of process claims where, for example, a husband allegedly used a bench warrant for his wife in order to coerce her into granting him visitation with their children, *Strid*, 331 N.W.2d at 355, and where university officials obtained an emergency mental health commitment order against a student about whom they had no actual mental health concern but instead simply wanted to prevent from physically leaving the school, *Maniaci v. Marquette Univ.*, 184 N.W.2d 168, 175 (Wis. 1971).

When viewed against this legal backdrop, Defendants' abuse of process claim cannot survive to trial. The Court will accept for argument's sake that Plaintiffs intended to harm Defendants' business by filing this suit. But this nefarious motive, standing alone, is insufficient; there must also be an actual misuse of process. Defendants have not created a jury question on that second element. When Plaintiffs filed this lawsuit, a legitimate dispute existed about the contractual relationship between the parties and about Corncob's advertisements. A civil lawsuit is a proper means of resolving those types of disputes. There is simply no evidence that Plaintiffs used this action as a "means of extortion" against Defendants in the way Wisconsin courts find probative of an abuse of process. *See Schlafer v. Quality Concrete Prods.*, 492 N.W.2d 187 at *3 (Wis. Ct. App. 1992) (unpublished table decision) ("The normal prosecution of a civil lawsuit, whatever the motivation, is not an abuse of process, even if the conduct may be considered outrageous by many. A complaint does not state a claim for abuse of process if it merely alleges that the defendant maliciously brought a false lawsuit to harm the plaintiff.") (internal citations omitted).

Finally, as to the evidence regarding Plaintiffs' motion to voluntarily dismiss some claims, and then their attempted withdrawal of that motion, the Court has already addressed that issue with the more appropriate remedy—awarding Defendants their fees, *see infra*. Defendants' claim for abuse of process will be dismissed.

7.    **PLAINTIFFS' RULE 56(d) MOTION**

After Defendants filed their motion for summary judgment, Plaintiffs filed a motion under Rule 56(d) to allow them time to depose five "critical" witnesses: Mark Rasmussen, Greg Ackerson, Alex Pepin, Mark Enochs, and Northern Star Company's designated corporate witness, Joe

Peter (collectively, the "Deponents"). (Docket #70).[7] Plaintiffs say the testimony they hope to elicit from these deponents is necessary to prove the money damages to which they believe they are entitled for their Lanham Act claim. *Id.*

The Plaintiffs' motion will be denied. First, Plaintiffs did not exercise sufficient diligence in seeking the Deponents' testimony before it became necessary in summary judgment briefing. The Court's Trial Scheduling Order set a dispositive motion deadline of June 3, 2019. (Docket #22). Plaintiffs waited until May 23, 2019 to serve subpoenas on the Deponents. Plaintiffs say that they tried to schedule the depositions prior to issuing subpoenas, but the Deponents refused to agree on any dates Plaintiffs proposed. If this is so, Plaintiffs should have asked the Court to compel the Deponents to sit for depositions with sufficient time that the discovery could be taken before Plaintiffs' summary judgment response was due. Plaintiffs do not argue that they need discovery on something raised in Defendants' summary judgment motion for which they could not have planned in advance. They simply waited too long.

Further, the discovery Plaintiffs seek regarding money damages is not necessary given the Court's finding that Plaintiffs cannot prove all elements of their Lanham Act claim. Specifically, because Plaintiffs cannot prove that Corncob's advertisement of the Corncob I caused them, or is likely to cause them, any injury, they are entitled to no remedy, including money damages. Further, Plaintiffs' Rule 56(d) motion ties their money damages (and the evidence they need to prove them) to the alleged

---

[7]Plaintiffs' motion was filed as an expedited motion under Civil Local Rule 7(h), which limits the motion to three pages and any accompanying affidavit to two pages. Civil L. R. 7(h)(2). Plaintiffs' affidavit supporting its motion, (Docket #71), is ten pages long, and therefore blatantly violates the rule. It will be stricken.

misrepresentations Apex and Defendants made to Michael Foods about the cost of the Corncob II and the Leachbuster. As noted above, these alleged misrepresentations are not a proper basis for Plaintiffs' Lanham Act claim.

Finally, in light of the above, the motions for protective order brought by non-parties Apex, Greg Ackerson, Mark W. Rasmussen, and Alexander Pepin (Docket #54) and by Mark Enochs and MNX, Inc. (Docket #55), will be denied as moot. The Court declines the movants' entreaty to award them fees incurred in bringing the motions.

## 8.     OTHER MISCELLANEOUS MOTIONS

Having resolved Plaintiffs' claims on their merits, the Court will deny as moot Defendants' motion to compel, (Docket #30), which seeks responsive documents and a corporate representative to testify on topics related to Counts IV through VII of Plaintiffs' complaint. Given that there will be no trial in this case, the Court will deny as moot Plaintiffs' motion to extend the discovery deadline, (Docket #101), in which Plaintiffs seek time to collect certain testimony for use at trial. For the same reason, the Court will also deny as moot the parties' motions *in limine*. (Docket #109, #111, #113, #115, #116, and #117).

Finally, the parties' myriad motions to restrict certain documents pursuant to the protective order in this case will be granted. (Docket #43, #46, #77, #82, #95, #105, and #107).

## 9.     CONCLUSION

For the reasons stated herein, Plaintiffs' and Defendants' respective motions for summary judgment with both be granted. This case will be dismissed in its entirety. Plaintiffs shall pay the reasonable fees and costs Defendants incurred to defend against Counts IV through VII of the Plaintiffs' complaint.

Accordingly,

**IT IS ORDERED** that Plaintiffs' motion to dismiss (Docket #24) be and the same is hereby **DENIED**;

**IT IS FURTHER ORDERED** that Plaintiffs pay Defendants' reasonable fees and costs related to Defendants' preparation of a defense to Counts IV through VII of the complaint (Docket #1);

**IT IS FURTHER ORDERED** that Defendants' motion to compel (Docket #30) be and the same is hereby **DENIED as moot;**

**IT IS FURTHER ORDERED** that Plaintiffs' motion for summary judgment (Docket #38) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that Defendants' motion for summary judgment (Docket #47) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that the motions for a protective order brought by non-parties Apex Efficiency Solutions, SBC, Greg Ackerson, Mark W. Rasmussen, and Alexander Pepin (Docket #54) and by Mark Enochs and MNX, Inc. (Docket #55), be and the same are hereby **DENIED as moot;**

**IT IS FURTHER ORDERED** that Plaintiffs' motion for reconsideration (Docket #66) be and the same is hereby **DENIED as moot**;

**IT IS FURTHER ORDERED** that Plaintiffs' Rule 56(d) motion (Docket #70) be and the same is hereby **DENIED**;

**IT IS FURTHER ORDERED** that Plaintiffs' affidavit accompanying its Rule 56(d) motion (Docket #71) be and the same is hereby **STRICKEN;**

**IT IS FURTHER ORDERED** that Plaintiffs' motion for an extension of the discovery deadline (Docket #101) be and the same is hereby **DENIED as moot;**

**IT IS FURTHER ORDERED** that the parties' motions in limine (Docket #109, #111, #113, #115, #116, and #117) be and the same are hereby **DENIED as moot**;

**IT IS FURTHER ORDERED** that the parties' motions to restrict documents (Docket #43, #46, #77, #82, #95, #105, and #107) be and the same are hereby **GRANTED**; and

**IT IS FURTHER ORDERED** that this action be and the same is hereby **DISMISSED with prejudice**.

The Clerk of the Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 10th day of September, 2019.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge